IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ERIC VAUGHN SCHULTZE, | § | |
| TDCJ #1085880, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-0230 |
| | § | |
| NATHANIEL QUARTERMAN, Director, | § | |
| Texas Department of Criminal Justice - | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Eric Vaughn Schultze (TDCJ #1085880) is an inmate incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division (collectively, "TDCJ"). Schultze has filed a petition under 28 U.S.C. § 2254, seeking a federal writ of habeas corpus to challenge his state court felony conviction. The respondent has filed an answer, arguing that Schultze is not entitled to relief. (Doc. # 8). Schultze has filed a response. (Doc. # 10). After considering all of the pleadings, the state court records, and the applicable law, the Court denies relief and dismisses this case for reasons that follow.

## I.    BACKGROUND AND PROCEDURAL HISTORY

A state grand jury returned an indictment against Schultze, accusing him of aggravated sexual assault in Brazos County cause number 28691-361. That indictment alleged that Schultze acted in concert with two co-defendants, Valin Thomas Klock and Scott Alan Zunker, to sexually assault a young woman while she was unconscious and physically

unable to resist.  The assault occurred on or about July 1, 2000, at a house located at 3311

Bahia Street in College Station, Texas.  Schultze shared that residence with several other

individuals.[1]  The young men memorialized the sexual assault by videotaping the incident.

The videotape was given to the police during an investigation into the alcohol-related death

of one of Schultze's house mates, John Hickman.  The videotape contained footage of

Hickman on the night that he died.  Klock, who also resided at 3311 Bahia Street, gave the

tape to a friend, Jana French, who turned it over to police to determine if there was any

illegal activity associated with Hickman's death.

The videotape, which depicts Schultze, Klock, and Zunker repeatedly and cruelly

violating the unconscious victim constitutes conclusive proof that an aggravated sexual

assault took place.  The trial court admitted the videotape following a two-day suppression

hearing.  After viewing the videotape's vulgar contents during a joint trial of all three

defendants, a jury in the 361st District Court of Brazos County, Texas, found them all guilty

---

[1]       The record reflects that Schultze leased a house at 3311 Bahia Street with his brother, Matt
Schultze, his cousin, Travis Blount, and a friend, Gabe Huckaba in 1999.  (*See Court
Reporter's Record*, Vol. 3).  Sometime thereafter, Huckaba moved out and Travis's brother,
Timothy Blount, moved in.  John Hickman also lived at the residence until his death on
November 19, 2000.  After Hickman's death, Valin Klock moved into the residence in
January of 2001.  Scott Zunker never lived at the house on Bahia Street.  It appears from the
record that some of these individuals attended a local junior college or university, or hoped
to enroll, but that not all of them were registered as students during this time period. All
residents at the 3311 Bahia premises were evicted at the end of March, 2001, following a
Spring Break trip to South Padre Island, after Eric Schultze, Klock, and Zunker were arrested
and charged with aggravated sexual assault.

as charged of aggravated sexual assault.  After a week-long punishment proceeding, the same

jury sentenced Schultze to 30 years' imprisonment.[2]

On direct appeal, Schultze argued that the videotape depicting the aggravated sexual

assault was wrongfully admitted at trial in violation of Texas law.  Schultze argued further

that the prosecutor made objectionable comments during closing argument and that the trial

court erred by excluding a witness during the punishment proceeding.  The intermediate

court of appeals rejected all of Schultze's arguments and affirmed the conviction after

making the following findings of fact based on the evidence at trial:

### Background

On November 19, 2000, College Station Police Department Detective
Chad Harkrider was called to investigate the alcohol-related death of John
Hickman at 3311 Bahia in College Station. When he arrived at the scene and
discovered there were numerous people to interview, he contacted College
Station Police Sergeant Chuck Fleeger for assistance. [Schultze] and Klock
were two of the people interviewed in connection with Hickman's death.
During the course of the investigation, Detective Harkrider received an
anonymous tip that there was a videotape of Hickman made on the night he
died.

On March 27, 2001, Jana French, a friend of Klock's, provided the
College Station Police Department with a videotape she had obtained from
Klock. Fleeger watched the videotape and discovered that, in addition to
depicting Hickman the night that he died, 18 minutes and 45 seconds of the
tape showed three men sexually assaulting an unconscious female. Fleeger
recognized [Schultze] and Klock as two of the three assailants because he had

---

[2]     Klock received a sentence of 22 years in prison.  *See Klock v. State*, 177 S.W.3d 53 (Tex.
App. — Houston [1st Dist.] 2005, pet. ref'd).  Zunker received a 15-year sentence.  *See
Zunker v. State*, 177 S.W.3d 72 (Tex. App. — Houston [1st Dist.] 2005, pet. ref'd).

recently interviewed them in connection with Hickman's death. He later determined the identities of the complainant[3] and the third assailant, Zunker.

The sexual assault[4] began with Zunker and [Schultze] entering a room where Klock was having sexual intercourse with the complainant, who appeared to be unconscious and physically unable to resist. [Schultze], while manning the video camera said, "in her fucking cunt," and Zunker attempted to insert a baseball in the complainant's vagina. Zunker manned the video camera while [Schultze] inserted the handle of a toilet plunger into the complainant's vagina. [Schultze] told Zunker, "Make sure you get this on tape." When the plunger handle was inserted into the complainant's vagina, she moaned and said, "Ow. Stop," and continued to struggle. The three men laughed throughout the entire sexual assault. At one point, Zunker lit a cigarette and burned the complainant's vagina with the lit cigarette. Zunker then, mockingly, said, "Ow. That's got to hurt," and he proceeded to flick ashes onto the complainant's buttocks. Zunker and Klock also inserted a screwdriver and other objects into the complainant's vagina. The men continued to laugh as they performed these various acts on the unconscious complainant, with [Schultze] declaring, "this is fucking hilarious" at one point during the assaults.

Police officers arrested [Schultze], Klock, and Zunker the day after Sergeant Fleeger received the videotape. Also on that day, police officers searched the house at 3311 Bahia and found a video camera and a camera bag that contained another videotape. This second videotape showed [Schultze] urinating on an unconscious Hickman.

During his investigation, Fleeger determined that the sexual assault occurred in July 2000, seven or eight months before the videotape was discovered.

---

[3]    Before the police showed her the videotape, the complainant did not know that she had been assaulted. She testified that she worked with Klock at a pub, and [that] she and some of her girlfriends were at a bowling alley when Klock and his friends arrived. Both groups went to another pub and then on to a bar that [Schultze] managed. There was excessive drinking, and the complainant did not remember any of the events occurring between the bar and waking up next to Klock in the Bahia house the next morning.

[4]    The description of the sexual assault is based on [the state court of appeals'] review of the videotape as well as Sergeant Jeff Capps's testimony from the guilt stage of trial.

*Schultze v. State*, 177 S.W.3d 26, 30-31 (Tex. App. — Houston [1st Dist.] 2005) (op. on rehearing) (footnotes in original).  Thereafter, the Texas Court of Criminal Appeals refused Schultze's petition for discretionary review.

Schultze challenged his conviction further by filing a state habeas corpus application under Article 11.07 of the Texas Code of Criminal Procedure.  In that application, Schultze argued that his conviction should be set aside because he was denied effective assistance of counsel at his trial.  Schultze argued that his trial attorney failed to do the following: (1) to call Schultze as a witness during the pretrial suppression hearing; (2) to file a motion in limine and object to opinions offered by the police and prosecutor that the videotape depicted an "aggravated sexual assault";  and (3) to request a jury instruction on the lesser included offense of sexual assault.  The state habeas corpus court, which also presided over the trial, entered detailed findings of fact and concluded that Schultze was not entitled to relief.  The Texas Court of Criminal Appeals agreed and denied relief based on lengthy findings and conclusions of law made by the trial-level habeas court.  *See Ex parte Schultze*, No. 68,096-01 at  297-315 (Tex. Crim. App. Oct. 10, 2007).

Schultze now seeks a federal writ of habeas corpus under 28 U.S.C. § 2254 to challenge his state court conviction.  Schultze contends that he is entitled to relief for the following reasons: (1) he was denied effective assistance of counsel; (2) the prosecutor violated his right to due process by making improper comments during closing argument of the punishment phase of his trial; and (3) the trial court denied him due process by depriving him of the opportunity to present testimony from a witness during the punishment

proceeding.  The respondent argues that Schultze is not entitled to relief on any of his claims under the governing federal habeas corpus standard of review set forth below.

## II.     STANDARD OF REVIEW

Federal review of the pending habeas corpus petition is subject to the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996).  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (holding that the AEDPA applies to those habeas corpus petitions filed after its effective date of April 24, 1996).  Embodying the principles of federalism, comity, and finality of judgments, the AEDPA "substantially restricts the scope of federal review of state criminal court proceedings." *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000).  Specifically, the federal habeas corpus statutes amended by the AEDPA, codified at 28 U.S.C. § 2254(d), set forth a "highly deferential standard for evaluating state-court rulings, . . . , which demands that state court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal citation omitted).

The federal habeas corpus statutes require applicants for relief to first present their claims in state court and to exhaust all state court remedies through proper adjudication.  *See* 28 U.S.C. § 2254(b).  To the extent that the petitioner's claims were adjudicated on the merits in state court, the AEDPA standard applies.  If a claim has not been adjudicated on the merits in state court, federal review is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Amos v. Scott*, 61

F.3d 333, 338 (5th Cir. 1995).  The procedural default rule also prevents habeas review when a petitioner has failed to meet state procedural requirements for presenting his federal claims, thereby depriving the state courts of an opportunity to address those claims in the first instance.  *See Coleman*, 501 U.S. at 730; *Rosales v. Dretke*, 444 F.3d 703, 707 (5th Cir. 2006) (noting that the procedural default rule prevents habeas petitions from avoiding the exhaustion requirement by defaulting their federal claims in state court).

For claims adjudicated on the merits, the AEDPA provides that a petitioner is not entitled to relief unless the state court's ultimate decision:

> (1)    was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2);  *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (observing that the AEDPA standard is restricted to the reasonableness of the state court's "ultimate decision, not every jot of its reasoning") (citation omitted). The burden is on the petitioner to show that he is entitled to relief under the highly deferential AEDPA framework. *See DiLosa v. Cain*, 279 F.3d 259, 262 (5th Cir. 2002).

Claims presenting pure questions of law and mixed questions of law and fact are governed by § 2254(d)(1).  *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).  The Supreme Court has clarified that "clearly established Federal law" or precedent for purposes of § 2254(d)(1) "refers to the holdings, as opposed to the dicta," of decisions from the United

States Supreme Court "as of the time of the relevant state-court decision." *Carey v. Musladin*,
549 U.S. 70, 127 S. Ct. 649, 653 (2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 412
(2000)). A state court decision is "contrary to" clearly established precedent if the state court
arrives at a conclusion opposite to one reached by the Supreme Court on a question of law
or if the state court decides a case differently from the Supreme Court "on a set of materially
indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an
"unreasonable application" of clearly established precedent if the state court identifies the
correct governing legal principle from the Supreme Court's decisions but unreasonably
applies that principle to the facts of the petitioner's case. *Id.*

Pure questions of fact are governed by § 2254(d)(2). *See Martin*, 246 F.3d at 475.
In addition, a state court's factual findings are entitled to deference on federal habeas corpus
review and are presumed correct under 28 U.S.C. § 2254(e)(1), unless the petitioner rebuts
those findings with "clear and convincing evidence." *Garcia v. Quarterman*, 454 F.3d 441,
444 (5th Cir. 2006) (citing *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005) and 28
U.S.C. § 2254(e)(1)). This deference extends not only to express findings of fact, but to the
implicit findings of the state court as well. *Garcia*, 454 F.3d at 444-45 (citing *Summers v.
Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir.
2004)). The petitioner's claims for relief are examined below under the applicable legal
standard.

## III.    DISCUSSION

### A.    Ineffective Assistance of Counsel

Schultze contends that he is entitled to relief because his retained criminal defense counsel, Lane Thibodeaux,[5] was ineffective for failing to call Schultze as a witness during the suppression hearing and that he was prejudiced as a result when the damaging videotape was admitted into evidence at trial.  Schultze complains that Thibodeaux also failed to file a motion in limine and object to opinions offered by the police and prosecutor that the videotape depicted an "aggravated sexual assault" or to request a jury instruction on the lesser included offense of sexual assault.  The state habeas corpus court rejected these claims after considering the entire record, which included an affidavit from Mr. Thibodeaux.  *See Ex parte Schultze*, No. 68,096-01 at 89-100, 297-315.  The Texas Court of Criminal Appeals adopted the state habeas corpus court's findings and denied relief.

Schultze contends that the state court's decision was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984), which establishes the test for ineffective assistance of counsel.  To prevail on an ineffective-assistance claim, a habeas petitioner must establish both elements of the *Strickland* test by showing that (1) counsel's representation was deficient, such that it "fell below an objective standard of reasonableness," and (2) that the deficient representation caused prejudice, which requires a showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688; *see also Williams v.*

---

[5]     The record shows that Schultze was represented at trial by Lane Thibodeaux, who served as lead counsel, and his wife, Beth Ann Thibodeaux, who is also an attorney.  Schultze's ineffective-assistance claims concern Mr. Thibodeaux's decisions.

*Taylor*, 529 U.S. 362, 390-91 (2002) (reciting the two-prong *Strickland* test).  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that rendered the result unreliable."  *Strickland*, 466 U.S. at 687.

To establish deficient performance, the petitioner must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.  Judicial scrutiny of counsel's performance must be "highly deferential," indulging in a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Riley v. Dretke*, 362 F.3d 302, 305 (5th Cir. 2004) (quoting *Strickland*, 466 U.S. at 689).

Even if defense counsel committed an error, a petitioner must still demonstrate actual prejudice as a result of his counsel's deficient performance.  Performance is prejudicial only if, but for counsel's errors, there is a reasonable probability that the final result would have been different and confidence in the reliability of the verdict has been undermined.  *See Leal*, 428 F.3d at 548 (citing *Little v. Johnson*, 162 F.3d 855, 860-61 (5th Cir. 1998)).  A "reasonable probability" in this context is "a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  Schultze's ineffective-assistance claims are examined below under the *Strickland* standard, beginning with his claim that Thibodeaux was deficient for failing to call him as a witness during the pretrial suppression hearing.

### 1.     Failure to Call Schultze as a Witness

The videotape that depicts Schultze and his co-defendants sexually assaulting the unconscious victim was the subject of a two-day suppression hearing.  *See Court Reporter's Record*, vols. 3-5, January 3-4, 2002.  As referenced above, Schultze's co-defendant, Valin Klock, took the videotape from the residence that Schultze shared with a number of other individuals.  Klock gave the videotape to a friend, Jana French, who then gave the videotape to police officers who were investigating the death of John Hickman.  Schultze insists that Klock stole the videotape from the residence before turning it over to an intermediary (French) to give to police.  Schultze complains that Thibodeaux was deficient for failing to call  him to testify at the suppression hearing to establish standing to complain of the videotape's theft from his home.  What follows is an overview of the suppression hearing, the appellate court's decision to uphold the admission of the videotape, and the state habeas corpus court's findings on this issue.

In addition to his written motion to suppress, Thibodeaux filed a lengthy post-hearing memorandum in support of his argument that the tape should be suppressed.  *See Clerk's Record*, vol. II, at 130-218.  Thibodeaux argued that the videotape was wrongfully taken and that Schultze had a greater right to possess the videotape than Klock.  Arguing that Klock committed theft by stealing the videotape, Thibodeaux maintained that the tape must be suppressed under the Texas exclusionary rule, found in Article 38.23 of the Texas Code of Criminal Procedure, which renders inadmissible any evidence "obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas,

11

or of the Constitution or laws of the United States of America[.]" The trial court denied the motion after finding that Schultze failed to show that the tape was obtained in violation of the law and was therefore inadmissible under Article 38.23. *See Clerk's Record*, vol. II, at 266-70.

The intermediate court of appeals upheld the trial court's decision on a different theory, holding that there was insufficient evidence to show that Schultze had standing to complain of the alleged theft by demonstrating that he had a recognizable expectation of privacy in the videotape:

> In point of error seven, [Schultze] contends that the trial court erred by denying his motion to suppress the sexual assault videotape "on the ground that Article 38.23 does not make stolen property inadmissible if a thief gives the property to the police." *See* TEX. CODE CRIM. PROC. ANN. art. 38.23 (Vernon Supp. 2004-2005).

### Standard of Review

> A trial court's ruling on a motion to suppress evidence will not be set aside unless there is an abuse of discretion. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996); *Taylor v. State*, 945 S.W.2d 295, 297 (Tex. App. — Houston [1st Dist.] 1997, pet. ref'd). We will afford almost total deference to a trial court's determination of facts supported by the record, especially when the findings are based on the evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Spight v. State*, 76 S.W.3d 761, 765 (Tex. App. — Houston [1st Dist.] 2002, no pet.). The appellate courts may review de novo "mixed questions of law and fact" not falling within this category. *Guzman*, 955 S.W.2d at 89.

### Standing

> [Schultze] filed a pretrial motion to suppress the videotape because "the videotape was taken from a home in which [appellant] had a privacy interest in violation of Article 38.23 V.A.C.C.P." Article 38.23 provides as follows:

12

No evidence obtained by an officer or other person in violation of any provision of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a). [Schultze] contends that Klock broke into the Bahia house and stole the videotape from [Schultze].

In its order denying the motion to suppress the videotape, the trial court found that "there [was] sufficient evidence to show that [Klock] had permission to be on the Bahia premises until well after Spring Break." The trial court also found that, "there is no evidence in the record that Defendant Klock, even if he took the video without Defendant Schultze's consent, intended to deprive Schultze of ownership." The trial court did not state whether [Schultze] had standing to complain of Klock's taking the videotape. However, failure to prove standing may be raised at any time, including for the first time on appeal. *State v. Klima*, 934 S.W.2d 109, 110-11 (Tex. Crim. App. 1996); *Pennywell v. State*, 84 S.W.3d 841, 843-44 (Tex. App. — Houston [1st Dist.] 2002, no pet.).

Standing is a question of law, which we review de novo. *State v. Johnson*, 896 S.W.2d 277, 285 (Tex. App. — Houston [1st Dist.] 1995), *aff'd*, 939 S.W.2d 586 (Tex. Crim. App. 1996). To have standing, or a reasonable expectation of privacy, a defendant must show: (1) that he had an actual, subjective expectation of privacy, exhibited by measures taken to protect the privacy of the property in question, and (2) that his subjective expectation of privacy is one that society is prepared to recognize as reasonable. *See Jackson v. State*, 745 S.W.2d 4, 7 (Tex. Crim. App. 1988).

During the suppression hearing, [Schultze] called Travis Blount to testify. Blount testified that he was [Schultze]'s cousin and lived with [Schultze] at 3311 Bahia Street at the time of the assault. Blount testified that the video camera used to film the assault belonged to Taylor Jordan — it was not [Schultze]'s camera. Travis testified that when Jordan left the camera at the

house, he left it in the case, and it was possible that there were some tapes left in the case. Travis never saw what brand of videotapes [Schultze] bought; therefore, he could not comment on whether the videotape used to tape the assault was one of the tapes [Schultze] bought or one that may have already been in Jordan's video case.

Sergeant Fleeger testified during the suppression hearing that, after the police saw the videotape, they obtained a search warrant for the house on Bahia. When they executed the warrant, they found the video camera and case in the living room. They found an .8 mm videotape in the case. Through his investigation, Fleeger concluded that the video camera and bag did not belong to [Schultze]. [Schultze] did not testify at the suppression hearing.

The evidence elicited during the suppression hearing did not reveal who owned the videotape that contained the recording of the assault, where the videotape was usually kept, or from where the videotape was removed. There is no evidence in the record indicating what steps [Schultze] took to protect the videotape. Nor is there any evidence that access to the videotapes was limited in any way. In fact, Blount testified that the occupants of the Bahia house frequently watched tapes they made with their friends. He testified that, after Klock moved out, Blount came home to find Klock, alone in the house, watching a videotape of Hickman's death.

[Schultze] failed to present sufficient evidence during his suppression hearing to establish that he took any measures to protect the privacy of the property in question and, therefore, did not show he had a reasonable expectation of privacy in the videotape recovered from their home. *See Jackson*, 745 S.W.2d at 7. The evidence in the record does not establish that [Schultze] had standing to have the videotape suppressed.

*Schultze v. State*, 177 S.W.3d at 31-33. Because Schultze did not establish the requisite standing, the appellate court held that "the trial court did not abuse its discretion in denying [his] motion to suppress the videotape." *Id.* at 33.

Noting that the appellate court found insufficient evidence to establish his standing, Schultze complained on state habeas corpus review that Thibodeaux was deficient for failing to call him as a witness to present evidence on this issue. In response to this claim,

Thibodeaux outlined his effort to establish Schultze's standing and to suppress the videotape

that was allegedly stolen by Klock:

> I filed a Motion to Suppress Evidence, claiming that the videotape central to the State's case was owned by [Schultze] and had been illegally seized from [Schultze]'s house. (CR at 9). A lengthy pretrial hearing on the Motion to Suppress was conducted over two days (January 3-4, 2002) involving multiple witnesses. (RR, Vol. 3, pp. 12-117; RR, Vol. 4, pp. 13-135; RR, Vol. 5, pp. 3-15).

> [After the hearing,] I filed my Written Summation and Argument of Defendant Eric Schultze's Motion to Suppress ("Written Summation") (CR at 130), in which I argued, among other issues, that [Schultze] had standing. (CR 136-39). The specific evidence supporting standing consisted of the complaint I had instructed [Schultze] to file with the College Station Police Department alleging that his house had been burglarized and one 8 mm tape had been stolen and the testimony of Travis Blount. . . . The Police Report was admitted at the suppression hearing. Blount testified that [Schultze] had rented the house from which the videotape was taken, that videotapes at [Schultze]'s home belonged to [Schultze] and, finally, he knew of no videotapes in [Schultze]'s house that did not belong to [Schultze]. (RR, Vol. 3, at 24-25).

*Ex parte Schultze*, No. 68,096-01 at 90-91 (Thibodeaux's affidavit). In addition,

Thibodeaux explained that other issues, such as his client's lack of restraint and candor,

counseled against calling Schultze as a witness at the suppression hearing:

> [Schultze] reasons that I could have called him to testify as to the issue of standing, without [Schultze] being subjected to cross-examination, pursuant to Tex. R. Evid. 104(d) . . . Rule 104(d) would have allowed me to put my client on the stand for the limited purpose of establishing standing.

> However, had [Schultze] opened the door to other subjects while on the stand, the prosecutor would have been permitted to go into those areas. *See Ex parte Homan*, 963 S.W.2d 543, 545 (Tex. App. — Corpus Christi 1996, pet. dism'd); *accord, Benavides v. State*, No. 03-05-00464-CR, 2007 Tex. App. LEXIS 2691, *15-*16 (Tex. App. — Austin 2007, pet. dism'd) (not designated for publication).

15

I chose to advise [Schultze] not to testify at the suppression hearing based on my experience with him. [Schultze] talked excessively when discussing the case. I felt [Schultze] had the capacity to exaggerate his claims, especially under stress. I worried [about] calling [Schultze] to testify because of this. In retrospect, I believe these concerns were valid. Two important events illustrate this: First, [Schultze] withheld from me his arrest in August of 2001 for Evading Arrest while out on bond. [Schultze] was arrested, pled "no contest" and was placed on deferred adjudication on the charge in Bexar County on September 27, 2001 — a time before the hearing on the Motion to Suppress. Had the arrest occurred after September 1, 2001 — three weeks later — the charge would have been a felony because a vehicle was involved. I discovered the arrest, not from [Schultze], but from the State after the hearing and ruling on the Motion to Suppress but before trial. When I confronted [Schultze] with the information shortly before trial, only then did he acknowledge the arrest, plea and disposition.

Second, [Schultze] exaggerated his collegiate athletic history to our punishment expert, Dr. James Ezell, despite explicit instruction by me to be fully forthcoming with Dr. Ezell. [Schultze] claimed to have played football at Texas Tech University (RR, Vol. 25, p. 110) and being "red shirted" at Texas A&M University because he "couldn't play." (RR, Vol. 25, p. 113). Both claims were exaggerated, particularly the claim regarding being "red shirted" at Texas A&M. David Batson, the Director of Athletic Compliance at Texas A&M testified on rebuttal that [Schultze] participated as a 12th Man walk-on — a one-day tryout — for which he was not selected. (RR, Vol. 27, pp. 5-62).

[Schultze]'s lack of candor effectively sabotaged the thrust of our punishment theory, namely, that he was a good probation candidate whose lack of direction and problems with alcohol stemmed in part from the loss of athletics in his life and whose arrest had forced him to come to grips with these problems. They also illustrate the reasons I was wary to call [Schultze], even for limited purposes at the hearing on the Motion to Suppress.

Notwithstanding, [Schultze] complains that I did not call him to testify at the suppression, and that he did not understand why he was not called to testify 'to establish [his] reasonable expectation of privacy in the videotape.' . . . Before the pre-trial hearing, I discussed with [Schultze] extensively the necessity to establish standing and whether he would testify on the issue. Following the testimony of Timothy Blount, but before resting on the Motion to Suppress, I spoke, again, with [Schultze] concerning the standing issue and

16

whether to call him to testify for that limited purpose.  I advised him that I could call him for that limited purpose, but based particularly on the Blount testimony, I believed sufficient evidence to meet the standing requirements existed without taking the risk of calling him to testify.  [Schultze] assented to this strategy and chose not to testify on the issue.  At the end of the hearing, I believed that I had placed sufficient evidence before the Trial Court which showed that [Schultze] had a possessory right to the videotape over Klock. *See* Written Summation.  (CR at 135-145).

[Schultze] also seems to complain that I should have requested that the State grant use immunity to enable Klock to testify at the suppression hearing. . . . Although I did attempt to call Klock to testify, the record reflects that I knew in advance that his counsel would assert the Fifth Amendment.  (RR, Vol. 4, pp. 6-7).  Moreover, the prosecutor was seeking significant penitentiary time for all three defendants.  I believe he would not have granted my third party request to provide Klock some concession in return for his testimony.

*Id.* at 91-94.  Thus, Thibodeaux opined that his advice was sound and that his actions were consistent with reasonable trial strategy.

The state habeas corpus court reviewed the entire record, including the appellate court's opinion and Thibodeaux's affidavit, and made the following findings of fact regarding counsel's alleged deficiency for failing to call Schultze as a witness at the suppression hearing:

8.    This Court did not rule specifically that [Schultze] had standing. (*See* State's Exhibit D: Memorandum Order on Motion . . . CR at 266). Instead, this Court denied the motion to suppress on the basis that [Schultze] did not prove that Klock lacked permission to be in the house or intended to deprive [Schultze] of the videotape. (*See* State's Exhibit D:  Memorandum Order on Motion . . . CR at 266-270).

9.    On appeal, the court of appeals ultimately held that the record did not establish that [Schultze] had standing to have the videotape suppressed, and thus, the trial court did not abuse its discretion in denying the motion to suppress the videotape. *Schultze v. State*, 177 S.W.3d at 33.

17

10.    Mr. Thibodeaux states in his second affidavit (attached to State's Answer as State's Exhibit A) that, although he knew he could establish standing by calling [Schultze] to the stand, he believed that standing was established through testimony of Timothy Blount. (State's Exhibit A, p. 5: Affidavit of Lane Thibodeaux). *Also see* (State's Exhibit B: Written Summation and Argument of Defendant Eric Schultze's Motion to Suppress, pp. 6-11; CR at 135-140).

11.    Mr. Thibodeaux "discussed with [Schultze] extensively the necessity to establish standing and whether he would testify on the issue." (State's Exhibit A, p. 5: Affidavit of Lane Thibodeaux).

12.    After conferring with Mr. Thibodeaux, [Schultze] assented to this strategy and chose not to testify on the issue.  (State's Exhibit A, p. 5: Affidavit of Lane Thibodeaux).

13.    [Schultze] does <u>not</u> allege in his application or his own affidavit ([Schultze]'s Exhibit 3) that he insisted to Mr. Thibodeaux that he wanted to testify and that counsel interfered with that right.

14.    Mr. Thibodeaux states in his affidavit that he wanted to prevent his client from being thoroughly cross-examined by the prosecutor.  He notes in his affidavit that "[Schultze] talked excessively when discussing the case.  I felt [Schultze] had the capacity to exaggerate to justify his claims, especially under stress.  I worried [about] calling [Schultze] to testify because of this."   (State's Exhibit A, p. 4: Affidavit of Lane Thibodeaux).

*Ex parte Schultze*, No. 68,096-01 at 278-85.  Based on these findings of fact, which Schultze does not refute, the state habeas corpus court concluded that Thibodeaux's decision to not call Schultze as a witness was reasonable trial strategy and that his performance was not deficient:

54.    In the past, we examined counsel's decision on whether a defendant will testify as part of counsel's trial strategy.  [footnote omitted].  In examining that strategy, we keep in mind that "the decision whether to put a defendant on the stand is a 'judgment call' which should not

easily be condemned with the benefit of hindsight." [footnote omitted]. *United States v. Mullins*, 315 F.3d 449, 453 (5th Cir. 2002).

55.   Tex. R. Evid. R. 104(d) would not have insulated [Schultze] from being cross-examined by the State as to things the defendant himself may say during direct examination that opens the door to other matters.  *Ex parte Homan*, 963 S.W.2d 543, 545 (Tex. App. — Tyler 1996), pet. dism'd, *improvidently granted*, 962 S.W.2d 599, 600 (Tex. Crim. App. 1998); *accord, Benavides v. State*, No. 03-05-00464-CR, 2007 Tex. App. Lexis 2691, *15-*16 (Tex. App. — Austin 2007, pet. dism'd) (not designated for publication.

56.   Counsel's performance was not deficient in failing to call [Schultze] to testify at the suppression hearing.  Not calling [Schultze] to testify was reasonable trial strategy.

*Ex parte Schultze*, No. 68,096-01 at 291.  Thus, the state court concluded that Thibodeaux's strategic decision was reasonable and that he was not deficient for failing to call Schultze as a witness at the suppression hearing.

Strategic decisions made by counsel during the course of trial are entitled to substantial deference in the hindsight of federal habeas review.  *See Strickland*, 466 U.S. at 689 (emphasizing that "[j]udicial scrutiny of counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight").  A federal habeas corpus court may not find ineffective assistance of counsel merely because it disagrees with counsel's chosen trial strategy. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999).  It is well established that "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997); *Garland v. Maggio*, 717 F.2d 199,

206 (5th Cir. 1983) (citing *Fitzgerald v. Estelle*, 505 F.2d 1334 (5th Cir. 1975); *Daniels v. Maggio*, 669 F.2d 1075 (5th Cir. 1982)); *see also Geiger v. Cain*, — F.3d —, 2008 WL 3021017, \*5 (5th Cir. 2008). *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002) ("'Informed strategic decisions of counsel are given a heavy measure of deference and should not be second guessed.'") (quoting *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999)).

The record supports the state court's conclusion that Thibodeaux's decision to not call Schultze as a witness was reasonable. The evidence shows that Thibodeaux advised Schultze not to testify because doing so would have exposed him to cross-examination on other issues. Schultze does not dispute that he agreed with this strategic decision. Schultze likewise does not dispute his counsel's concerns about his propensity to exaggerate, his lack of candor, and his arrest while out on bond for the charged offense. Under these circumstances, Schultze fails to show that his trial attorney's decision not to call him as a witness to establish standing at the suppression hearing was unreasonable or that it tainted his trial with fundamental unfairness. Accordingly, Schultze fails to show that he was denied effective assistance of counsel at the suppression hearing or that the state court's decision to deny relief on this issue was incorrect or unreasonable. Alternatively, for reasons discussed further below, Schultze fails to demonstrate actual prejudice as the result of his counsel's alleged failure to call him as a witness to establish standing at the suppression hearing

### 2.     Alternatively, No Actual Prejudice

In his affidavit to the state habeas corpus court, Thibodeaux acknowledged that his motion to suppress the videotape was denied, but noted that the trial court did not base its

decision on standing.  *Ex parte Schultze*, No. 68,096-01 at 91.  Thibodeaux observed that the trial court instead denied the motion on the merits, finding that the evidence was sufficient to show that Klock did not steal the videotape as alleged because he had permission to be on the premises.  (*Id.*).  To demonstrate actual prejudice as the result of his counsel's alleged failure to establish standing, Schultze must show that the trial court erred by denying his motion to suppress on the merits.

In support of his ineffective-assistance claim, Schultze insists that the videotape should have been suppressed under Article 38.23 of the Texas Code of Criminal Procedure because, as Klock represented in an unsworn declaration in support of Schultze's state habeas application, Klock stole the tape with no intent to turn it over to police.  The state habeas corpus court rejected Schultze's assertion that the videotape should have been suppressed pursuant to Article 38.23,  and found that Klock's unsworn account was refuted by the evidence in the record, including testimony given during the suppression hearing:

> 15.     [Schultze] alleges that co-defendant Valin Klock committed the offense of theft in obtaining the tape.  (Application, p. 6b). [Schultze] necessarily argues that "[w]hen Klock stole the videotape from Schultze's home, he did not intend to give it to the police; indeed, he refused [Jana] French's request to do so.  Furthermore, he did not believe that the videotape contained evidence of a crime at the time that he stole it." (Brief in Support of Application, p. 9).

> 16.     There is sufficient evidence to show that Valin Klock had permission to be in [Schultze]'s house, located at 3311 Bahia:

>> •    Valin Klock was a resident of 3311 Bahia during and after Spring Break 2001.  (RR vol. 3, p. 106, 109).

- Valin Klock was not given a key to 3311 Bahia, at the time he moved in.  (RR vol. 3, p. 80).  However, he was free to find another way to enter 3311 Bahia, assuming it was locked.  (RR vol. 3, p. 81).

- Klock had welcome and unfettered access to the premises at all times — even after he moved out.  (RR vol. 3, pp. 40, 41, 52, 54, 57, 80, 104, 106, 116).

- Klock had property inside 3311 Bahia up until March 26, 2001.  (RR vol. 3, pp. 84, 108).

- Jana French helped Klock move[] out of 3311 Bahia on March 26, 2001.  (RR vol. 3, pp. 106; RR vol. 4, p. 95; RR vol. 5, p. 7).

- Jana French testified that she turned the videotape in to police on March 26th.  (RR vol. 3, p. 105).

- There was no evidence of damage or forced entry to 3311 Bahia after the Blounts returned from  spring break in early March 2001.  (RR vol. 3, p. 53).

- Travis Blount testified that, after spring break, Klock was in the living room of 3311 Bahia, watching the tape that contained John Hickman. (RR vol. 3, p. 53).  Thus, the videotape was still at 3311 Bahia after spring break.  (RR vol. 3, p. 54).

- There was no evidence of when the tape was allegedly taken or where it was taken from.  (RR vol. 3, pp. 35, 86).

- In his interview with police on March 28, 2001, [Schultze] described Klock's status at 3311 Bahia as:  "he's been staying here like at least the last two months."  . . . [Schultze] does not mention Valin Klock moving out before Spring Break 2001, as his cousins testified during the pretrial hearing.

17.    Valin Klock now states, in his unsworn declaration attached to the application, that "I told Jana French, a friend of Hickman's, that I stole a videotape from Schultze's home that depicted Hickman's death.  She wanted me to give it to the police.  I refused.  Eventually, she convinced me to give it to her.  I learned that she gave it to the police."

22

([Schultze]'s Exhibit 2: Unsworn Declaration of Valin Thomas Klock, pp. 1-2).

18.     Jana French testified during the pretrial suppression hearing.  (RR vol. 3, pp. 92-117).  Her testimony is attached as State's Exhibit F to the State's Answer.

19.     French's testimony includes the following:

Q       (By Schultze's counsel):  In any event the fact of the matter is that Valin Klock — you asked Valin Klock to turn the videotape in.  You wanted Valin to do it; is that true?

A.      (By Jana French):  Or give it to me to turn in.  **He didn't know what to do with it**.

Q.      But you asked him — My question to you is: You asked him to turn it in to the police, true?  Is that what I heard you say?

A.      Or to give it to me.  It didn't matter who turned it in.  I just wanted it to be turned in.

Q.      The fact of the matter is: You were the one and not Valin Klock who actually physically carried it over to the College Station Police Department, correct?

A.      Yes.

(RR 3, pp. 97-98).

20.     On cross-examination by the prosecution, French stated unequivocally that Klock gave her the videotape so that it could be turned over to the police:

Q.      (By the prosecution):  Valin had given the tape to Gabe Huckaba and very quickly retrieved the tape from him to give it to you?

A.      Yes.

Q.      There is no question in your mind that Valin Klock gave you the tape to give it to the police?

A.   Yes.

Q.   In fact, he knew that was what you were going to do with it?

A.   Yes.

Q.   And it was his purpose to your knowledge in giving you the tape that it be given to the police?

A.   Yes.

Q.   Because it depicted the death of his friend, John Hickman, on it; is that right?

A.   Yes.

(RR vol. 3, pg 111-112; State's Exhibit F).

21.   Jana French testified that the period, from the time she first learned of the videotape to the time she turned it over to the police, was 48 hours. (RR vol. 3, p. 112; State's Exhibit F).

22.   Jana French's sworn testimony clearly rebuts Klock's recent unsworn declaration.

23.   During the pretrial hearing, Klock's trial counsel, Kyle Davis, admitted the transcript of Valin Klock's taped statement to police as Klock Exhibit No. 1.  (RR vol. 5, p. 37).  *Also see* RR vol. 30 — Klock Exhibit 1).  Klock Exhibit 1 is attached to the State's Answer as State's Exhibit G.

24.   Valin Klock made the following statement to the police on March 28, 2001:

VK [Klock]:  . . . then Janna [sic] calls me up and uh she was like "What are you gonna do with that tape?"  and I told her I was like "I don't know you know  I'm not destroying it you know uh I don't  if there's anything on there the police need to see I mean I'm sure there's I don't know I think **that's eventually what I was going to do with it** but she was like "well I wanna kinda see it

but I think we should take it to them" and I was like "all right" I didn't think then she was like "let's do it right now" and I'm like "just relax" you know cause it was like eleven o'clock at night I think I was like (not audible) "we'll wait till the morning" and that's when uh she helped me with my computer and [to] get my computer out of there and then that's when we went to Gabe's I got the tape from Gabe and gave it to her.

JC [Detective Jeff Capps]:  OK.

VK [Klock]: Then what she did with it just I guess brought it over here. . . . (State's Exhibit G, at p. 6, transcript of Valin Klock's taped statement to police).

25.   Consequently, Klock's own statement to police clearly rebuts his unsworn statement found in [Schultze]'s Exhibit 2 ["She wanted me to give it to the police; I refused. Eventually, she convinced me to give it to her. I learned that she gave it to police."].

26.   The affidavit of Valin Klock ([Schultze]'s Exhibit 2) is not credible evidence.

27.   [Schultze]'s taped statement to police was admitted during the pretrial hearing as State's Exhibit 21.  (RR vol. 4, p. 129).

28.   The transcript of [Schultze]'s taped statement was also admitted during the pretrial hearing as State's pretrial exhibit 21A.  (RR vol. 4, p. 131); *also see* RR vol. 30 — State's pretrial exhibit 21A.  Said transcript is attached as State's Exhibit E to the State's Answer.

29.   In his interview with the police, [Schultze] initially denied knowledge of the sexual assault recorded in the videotape.  He further claims that the video camera at 3311 Bahia did not work and had no battery. (State's Exhibit E: transcript of [Schultze]'s statement, p. 3).  He also asked the police, more than once, where they obtained the tape and asserted that he "thought he threw it away."   (State's Exhibit E: transcript of [Schultze]'s statement, pp. 12-13).

30.   Eight months passed, from the day of [Schultze]'s police interview, before [Schultze] changed his story and filed a burglary of a habitation

25

report on November 27, 2001, claiming that Klock had "stolen" the
videotape. (RR vol. 4, p. 14). Also see (State's Exhibit A, p. 2; State's
Exhibit D, pp. 267-268).

31.     The affidavit of [Schultze] ([Schultze]'s Exhibit 3) is not credible
        evidence.

32.     The credible facts in this case show that Klock initially "didn't know
        what to do with [the videotape]." Klock gave the videotape in question
        to Jana French with the intent that it should be turned over to the police.
        Jana French took it to the police within 48 hours of discovering the
        existence of the tape.

*Ex parte Schultze*, No. 68,096-01 at 278-85 (emphasis in original). Thus, the state habeas

corpus court rejected the statements given by Schultze and Klock, finding that, based on the

credible evidence, Klock took the videotape from the residence while he still had permission

to be there and that he gave the tape to Jana French with the knowledge that she intended to

turn it over to police.

Based on these findings and credibility determinations, the state habeas corpus court

concluded that Schultze failed to establish deficient performance or actual prejudice because

he failed to show that the motion to suppress would have been granted:

57.     [Schultze] must prove that a motion to suppress would have been
        granted in order to satisfy *Strickland*, *see* for example, *Roberson v.
        State*, 852 S.W.2d 508, 510-12 (Tex. Crim. App. 1993) (unless there is
        a showing that a pre-trial motion had merit and that a ruling would have
        changed the outcome of the case, counsel will not be ineffective for
        failing to assert the motion).

58.     When a non-governmental actor takes property that is evidence of a
        crime without the consent of the owner and with intent to turn the
        evidence over to the police, the conduct may be non-criminal even
        though the person has the intent to deprive the owner [of that property].
        Therefore, Article 38.23 would not require exclusion of the evidence.

26

> *Jenschke v. State*, 147 S.W.3d 398, 402 (Tex. Crim. App. 2004); *Guerrero v. State*, No. 08-05-00284-CR, 2007 Tex. App. LEXIS 3837 (Tex. App. — El Paso 2007, no pet. hist.) (not designated for publication).

> 59.   Had [Schultze] testified during the motion to suppress and established standing to contest the taking of the videotape, he would not have prevailed on appeal, where the videotape was <u>not</u> taken in violation of Tex. Code Crim. Proc. art. 38.23.   *Guerrero*, *Jenschke*, *supra*.   Thus, [Schultze] has not shown that   any alleged deficient performance prejudiced the defense.

*Id.* at 291-92 (emphasis in original).   Thus, the state habeas corpus court rejected Schultze's claim that he was denied effective assistance of counsel at the suppression hearing because Thibodeaux failed to call him as a witness.

The record supports the state court's conclusion that Schultze was not prejudiced by deficient performance on his counsel's part because, even if standing were established, he failed to show that the motion to suppress would have been granted.   As the state court found, the credible evidence reflects that Klock took the videotape from the residence before he moved out and gave it to Jana French with the knowledge that she intended to give it to police.   The state court's findings and credibility determinations are entitled to the presumption of correctness, which Schultze has not rebutted with clear and convincing evidence.[6]   *See* 28 U.S.C. § 2254(e)(1).   With the requisite deference to the state courts

---

[6]   The state court's fact findings and credibility determinations are entitled to the presumption of correctness found at 28 U.S.C. § 2254(e)(1). *See Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002).   The presumption is especially strong when the state habeas court and the trial court are one in the same," as they were in this case.   *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000); *see also Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005) ("A trial court's credibility (continued...)

findings, Schultz failed to establish that the videotape was taken from his home illegally. Therefore, even if Schultze had testified on the issue of standing, he does not show that the videotape was inadmissible under Article 38.23. Absent a showing that the result of the proceeding would have been different, Schultze fails to establish that he was prejudiced by any alleged deficiency. *See Strickland*, 466 U.S. at 694. It follows that Schultze fails to show that the state court's decision on this issue was incorrect or unreasonable and he further fails to show that he is entitled to relief under 28 U.S.C. § 2254(d).

### 3.    Failure to File a Motion in Limine or Object

Schultze does not dispute that he sexually assaulted the victim by penetrating her vagina with the handle of a toilet plunger. Schultze notes that the State charged him with aggravated sexual assault on the theory that he committed a sexual assault while acting in concert with at least one other person, namely, Klock and Zunker, during the same criminal episode.[7] Believing that there was insufficient evidence to show that Klock and Zunker also penetrated the victim, Schultze complains that Thibodeaux was deficient for failing to file

---

[6](...continued)

determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are 'virtually unreviewable' by the federal courts.") (citations omitted). Schultze does not meet his burden to rebut those findings with clear and convincing evidence. Therefore, the state court's fact findings are presumed correct.

[7]    In Texas, a person commits the offense of aggravated sexual assault if he intentionally or knowingly "causes the penetration of the anus or sexual organ of another person by any means, without that person's consent" and "acts in concert with another" who engages in like conduct "directed toward the same victim and occurring during the same criminal episode." Tex. Penal Code §§ 22.021(a)(1)(A)(i), 22.021(a)(2)(A)(v).

a motion in limine or to object to any characterization by police or the prosecutor that the videotape depicted an "aggravated sexual assault."

In his affidavit to the state habeas corpus court, Thibodeaux conceded that he did not file a motion in limine or object to the characterization of the videotape or its contents as depicting an aggravated sexual assault.  Thibodeaux explained that his decision not to do so was based on trial strategy that he hoped would avoid calling additional attention to the aggravated nature of the offense:

> [Schultze] and I watched the videotape together; it was clear that Klock and Zunker penetrated the victim's sexual organ.  And, notwithstanding what Klock and Zunker's counsel argued during closing arguments, the court of appeals viewed the videotape (*See Schultze*, 177 S.W.3d t 31, fn. 5) and held that Klock and Zunker "inserted a screwdriver and other objects into the complainant's vagina." *See Schultze*, 177 S.W.3d at 31.  Moreover, the assaults depicted on the videotape were shocking.
>
> Consequently, preventing observations by the police that an aggravated assault had occurred, by way of a motion in limine or objection, would not have lessened the jury's opinion as to [Schultze's] guilt, after having the videotape, and may have antagonized them.

*Ex parte Schultze*, No. 68,096-01 at 94-95.  The state habeas corpus court found that Thibodeaux's trial strategy stemmed from his attempt to maintain "credibility with the jury" and concluded that this strategy was reasonable.

The record supports the state court's decision that Thibodeaux made a reasonable strategic decision not to file a motion in limine or to object when the prosecutor and the testifying officers described the videotape as depicting an aggravated sexual assault.  The videotape, which clearly depicts all three defendants penetrating the unconscious victim with

various objects during the course of the assault, speaks for itself. (Doc. # 9).[8] In that respect, the videotape constitutes dispositive evidence that an aggravated sexual assault occurred. Any effort to characterize the videotape as something other than "aggravated" in nature is simply unsupported and would likely have offended the jury further.

Schultze fails to persuade that Thibodeaux's strategic decision was unsound or to show that he had a meritorious objection to make.  It follows that Schultze fails to demonstrate deficient performance or actual prejudice.  *See Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006) (holding that counsel was not deficient in failing to present a meritless argument) (citation omitted);  *Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."); *Lavernia v. Lynaugh*, 845 F.2d 493, 499 (5th Cir. 1988) ("Counsel cannot be faulted for failing to pursue meritless motions.") (citations omitted); *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984) ("Counsel is not required to engage in the filing of futile motions."). Absent a showing that counsel was deficient, or that he suffered actual prejudice as a result, Schultze fails to establish a claim for ineffective assistance of counsel in connection with his attorney's alleged failure to raise an objection to the videotape's characterization.  Because Schultze does not establish that the state court's decision to deny relief was incorrect or unreasonable, it follows that he is not entitled to relief on this issue under 28 U.S.C. § 2254(d).

---

[8]     The videotape and the still photographs admitted as proof of penetration have been placed under seal to protect the victim's privacy.

### 4.        Failure to Request a Lesser Included Offense Instruction

Repeating his claim that the evidence was insufficient to prove that an aggravated sexual assault occurred, Schultze complains that Thibodeaux was deficient because he failed to request a jury instruction on the lesser included offense of simple sexual assault.  This claim is without merit for reasons articulated at length on state habeas corpus review.

In his affidavit to the state habeas corpus court, Thibodeaux explained that he did not request such an instruction because, in his opinion, the evidence did not support such a request:

> . . . [Schultze] complains that I failed to request a jury instruction on sexual assault and argue that [Schultze] was guilty only of sexual assault.  He reasons that "[h]ad the jury been instructed on sexual assault, counsel *plausibly* could have argued that Schultze should be convicted of that offense because, although he inserted the handle of a plunger in complainant's vagina, he did not act in concert with at least one other person to show beyond a doubt that defendant Klock placed his finger in 'A.M.''s vagina or that [Zunker] placed a screwdriver inside of 'A.M.'"
>
> As noted above, the videotape showed [that] all three defendants assaulted the victim.  The still frames from the videotape included in the exhibit volume (RR., Vol. 31) specifically exhibits 9-17, demonstrate, in my opinion, the implausibility of this assertion.  It was uncontested at trial that [Schultze] videotaped most, if not all the images depicted in exhibits 9-14.  The audio accompanying those images was testified to by Sergeant Jeff Capps [of the College Station Police Department] and includes statements from [Schultze] and his co-defendants such as "in her fucking cunt." (RR, Vol. 13, p. 44), "Fuck me.  We're going to hell." (*Id.*), "This is fucking hilarious." (RR Vol. 13, p. 45), and "Make sure you get this on tape." (*Id.*).  In my opinion there was no plausible chance that a jury would convict [Schultze] of the lesser included offense of sexual assault based on the theory now asserted by [Schultze].  To request a lesser charge and [have] argued such would have merely antagonized the jury and harmed our credibility with the jury during the punishment phase.

*Ex parte Schultze*, No. 68,096-01 at 95-96.   Thibodeaux added that requesting a lesser

included offense instruction on sexual assault would have been inconsistent with his chosen

trial strategy, which was to emphasize a "punishment case that asked the jury to consider the

positive aspects of [Schultze]'s entire life, and not just the videotape, when deciding his

sentence." *Id.* at 96-97.   By not seriously contesting guilt, Thibodeaux hoped to maintain

credibility with the jury with the hope that they could consider a reduced sentence or even

possibly probation. *Id.* at 97.

   The state habeas corpus court issued lengthy and detailed findings based on the

evidence, particularly the videotape, which clearly depicts a sexual assault by more than one

perpetrator acting in concert.   *See Ex parte Schultze*, No. 68,096-01 at 287-89.   After

describing the graphic and offensive nature of the defendants' actions, the state habeas

corpus court agreed with Thibodeaux that "a rationale jury would <u>not</u> have convicted

[Schultze] of the lesser included offense of sexual assault." *Id.* at 290 (emphasis in original).

Based on these facts, which Schultze does not refute, the state habeas corpus court concluded

further that Thibodeaux was not deficient for failing to request a jury instruction on the lesser

included offense of sexual assault:

> 63.   Counsel cannot be considered ineffective for failing to request a jury
> instruction for a lesser included offense which would either counteract
> the defensive theory or which would be damaging to [Schultze].   *See*
> *Ex parte Ewing*, 570 S.W.2d 941, 945 (Tex. Crim. App. 1978) (holding
> that trial strategy will be reviewed by appellate courts only if the record
> demonstrates that action was without any plausible basis).

> 64.   When evidence against a defendant is strong, conceding guilt can be
> part of sound trial strategy. *See Jordan v. State*, 859 S.W.2d 418, 422

(Tex. App. — Houston [1st Dist.] 1993, no pet.), in which the court held that:

> It is logical to conclude that trial counsel, faced with overwhelming evidence of appellant's guilt, chose to placate the jurors rather than to possibly antagonize them with an impassioned, though weakly supported, plea for a verdict of not guilty. Counsel clearly anticipated that any success he might garner for appellant would be limited to the punishment phase.

*Id.*

65.   Mr. Thibodeaux's decision not to request a lesser included [instruction for] sexual assault was legitimate trial strategy.

*Ex parte Schultze*, No. 68,096-01 at 293.  The state court concluded, therefore, that Schultze failed to demonstrate deficient performance.  *Id.*  The state court concluded further that Schultze failed to show that "any alleged deficient performance prejudiced his defense." *Id.* Thus, the state court rejected Schultze's ineffective-assistance claim based on Thibodeaux's failure to request a jury instruction on the lesser included offense of sexual assault.

This Court's own review of the record reveals that Schultze does not demonstrate that a reasonable jury would have convicted him of the lesser included offense of sexual assault, rather than aggravated sexual assault.  Likewise, Schultze does not show that the evidence supports a jury instruction on the lesser included offense of sexual assault or that the trial court would have granted such an instruction if requested.  Therefore, Schultze fails to show that the trial strategy pursued by his counsel was unsound or that his trial was rendered fundamentally unfair as a result.  *See Strickland*, 466 U.S. at 689.  Accordingly, Schultze

fails to establish deficient performance or actual prejudice due to his counsel's chosen trial strategy.  *See id.*, 466 U.S. at 694.

In summary, Schultze has failed to demonstrate a valid claim for ineffective assistance of counsel under the *Strickland* standard.  Schultze does not otherwise establish that the state court's decision to reject any of his ineffective-assistance claims was contrary to or involved an unreasonable application of clearly established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d)(1).  Therefore, he is not entitled to federal habeas corpus relief on these claims.

## B.    Prosecutorial Misconduct

Schultze complains that the prosecutor engaged in improper argument during the punishment phase of the proceeding.  He objects to the following remark, which asked the jury to consider the effect of the videotaped aggravated sexual assault on the victim's parents, who did not testify:

> Imagine the embarrassment, the humiliation that [the complainant] has had to go through.  Every time you think about the excuses the Defendants offered, think about [her], what she's going through, *what her parents are going through, what her dad is thinking knowing that his little girl was violated in the worst way*.

*See Court Reporter's Record*, vol. 28, at 50-51 (emphasis added).  Schultze argues that, because the victim's parents did not testify, the comment constitute prosecutorial misconduct in violation of his right to due process under the Fourteenth Amendment of the United States Constitution.

The respondent observes that Schultze presented a similar claim on direct appeal and in his petition for discretionary review, where he argued that the prosecutor's remark violated

state law by commenting outside the record.  The respondent notes that Schultze did not raise his federal constitutional claim on direct appeal or state habeas corpus review.  The respondent argues, therefore, that Schultze's federal claim of prosecutorial misconduct is unexhausted and that this claim is further barred by the doctrine of procedural default.  The respondent's arguments are addressed below, beginning with the doctrine of exhaustion.

### 1.      Exhaustion Doctrine

Under the applicable federal habeas corpus statutes, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A).  Thus, a petitioner "must exhaust all available state remedies before he may obtain federal habeas corpus relief."  *Sones v. Hargett*, 61 F.3d 410, 414 (5th Cir. 1995).  The exhaustion requirement "is not jurisdictional, but reflects a policy of federal-state comity designed to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Moore v. Quarterman*, 454 F.3d 484, 490-91 (5th Cir. 2006) (quoting *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (internal citations and quotations omitted)).  Exceptions exist only where there is an absence of available State corrective process or circumstances exist that render such process ineffective to protect the rights of the applicant.  *See* 28 U.S.C. § 2254(b)(1)(B).

To exhaust his state remedies under the applicable statutory framework, a habeas petitioner must fairly present "the substance of his claim to the state courts."  *Moore*, 454

F.3d at 491 (quoting *Vasquez v. Hillery*, 474 U.S. 254, 258 (1986)).  The exhaustion requirement is not met where the petitioner presents new legal theories or factual claims in his federal habeas petition.  *Moore*, 454 F.3d at 491.  Likewise, the Fifth Circuit has emphasized that, to exhaust a claim, "[i]t is not enough . . . that a somewhat similar state-law claim was made." *Wilder v. Cockrell*, 274 F.3d 255, 260 (5th Cir. 2001) (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).  The record confirms that Schultze did not present his federal constitutional claim of prosecutorial misconduct in state court, meaning that these claims are unexhausted.

### 2.      Doctrine of Procedural Default

As the respondent correctly notes, Schultze's failure to exhaust his state court remedies results in a procedural default.  It is well established that "[i]f a petitioner fails to exhaust state remedies, but the court to which he would be required to return to meet the exhaustion requirement would now find the claim procedurally barred, then there has been a procedural default for purposes of federal habeas corpus relief." *Finley*, 243 F.3d at 220 (citing *Coleman*, 501 U.S. at 735 n.1*, and *Sones*, 61 F.3d at 416).  Schultze's unexhausted claim could have been raised in his state habeas corpus application.  Accordingly, a successive petition would be barred by the Texas abuse-of-the-writ statute.  *See* TEX. CODE CRIM. PROC. ANN. art. 11.07, § 4(a).  Because Texas would likely bar another habeas corpus application by the petitioner on this subject, this default represents an adequate state procedural ground which, in turn, bars federal review of his claims.  *Finley*, 243 F.3d at 220 (citing *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995)).

"In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).   It is the petitioner's burden to show that the "independent and adequate" state procedural rule at issue is not firmly established and regularly followed, or that it was capriciously applied under the circumstances.  *See Wright v. Quarterman*, 470 F.3d 581, 586 (5th Cir. 2006) (citations omitted).  Schultze does not meet that burden here.  Schultze further fails to establish that any exception to the doctrine of procedural default applies.[9]   Therefore, Schultze's prosecutorial misconduct claim is procedurally barred from federal review.

### 3. Alternatively, Schultze's Claim is Without Merit

---

[9]   An exception to the doctrine of procedural default exists where the petitioner demonstrates either cause for the default and actual prejudice as a result of the alleged violation of federal law or that failing to consider his claim will yield a fundamental "miscarriage of justice." *Coleman*, 501 U.S. at 750.  Schultze has been represented by capable counsel throughout his post-conviction proceedings.  His appellate attorney, Murry B. Cohen, is a former justice on the First Court of Appeals for the State of Texas.  On state habeas corpus review, Schultze was represented by well known criminal defense counsel Randy Schaffer.  Schultze's federal habeas counsel is veteran attorney Richard E. Wetzel.  Schultze does not demonstrate cause for the procedural default and, for reasons discussed above, he does not demonstrate actual prejudice because his claim is without merit.  Likewise, Schultze does not allege or show that he is actually innocent or that his conviction has resulted in a fundamental miscarriage of justice.  Thus, Schultze does not satisfy any recognized exception to the procedural bar.

Alternatively, to the extent not procedurally barred, the respondent argues further that Schultze's prosecutorial misconduct claim is without merit. "In habeas corpus proceedings, [courts] review allegedly improper prosecutorial statements made during a state trial to determine whether they 'so infected the [penalty phase of the] trial with unfairness as to make the resulting [sentence] a denial of due process.'" *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) (quoting *Ables v. Scott*, 73 F.3d 591, 592 n.2 (5th Cir. 1996), and *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  To prevail on a claim concerning "improper prosecutorial argument," a habeas corpus petitioner must demonstrate that "'the misconduct [was] persistent and pronounced or that the evidence of guilt was so insubstantial' that but for the improper remarks the conviction or sentence would not have resulted." *Turner v. Johnson*, 106 F.3d 1178, 1188 (5th Cir. 1997) (quoting *Jones v. Butler*, 864 F.2d 348, 356 (5th Cir. 1988) (citations omitted)).  The statements must render the trial fundamentally unfair.  To meet this standard, the petitioner must show that "the prosecution's comments so infected the trial with unfairness that there is a reasonable probability that the result would have been different if the proceeding had been conducted properly." *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999) (citing *Darden v. Wainwright*, 477 U.S. 168 (1986), and *Foy v. Donnelly*, 959 F.2d 1307 (5th Cir. 1992)); *see also Barrientes*, 221 F.3d at 753 ("A trial is fundamentally unfair if 'there is a reasonable probability that the verdict might have been different had the trial been properly conducted.'").  Schultze falls far short of that showing in this case.

The intermediate court of appeals rejected Schultze's claim that the prosecutor engaged in improper argument by commenting outside the record, finding that the misconduct, if any, was insubstantial. *See Schultze*, 177 S.W.3d at 43-46.  The court of appeals considered all of the evidence presented during the punishment phase of the trial, including the favorable evidence from Schultze's family and friends about his caring nature and his other good qualities.  The court of appeals also noted the videotape evidence that showed Schultze sexually assaulting the victim while she was unconscious and observed that other videotape evidence also showed Schultze abuse his unconscious friend, John Hickman, who eventually perished in the house at 3311 Bahia Street from over-consumption of alcohol, among other things.  The appellate court concluded that, in light of the damaging videotape evidence, and other testimony about Schultze's violent tendencies, the isolated comment by the prosecutor did not unduly influence the jury or affect his substantial rights:

> In addition, the jury saw videotape evidence of [Schultze] engaging in truly barbaric behavior–the sexual assault of an unconscious young woman– by inserting a toilet plunger handle in her vagina and suggesting that Klock and Zunker force a baseball in her vagina, while he manned the video camera. [Schultze]'s misconduct was further emphasized by his laughter at the complainant during the assault even when her vagina was burned by a lit cigarette and a screwdriver was inserted in her vagina. During the assault, [Schultze] declared that it was "fucking hilarious." The jurors saw the videotape [Schultze] took of Hickman shortly before he died. They saw water being poured over his face, his penis being fondled, and his pubic hair being shaved while he lay unconscious. They saw a videotape [Schultze] took on another occasion while he urinated on Hickman while he lay unconscious on the bed. They heard testimony from several neighbors saying that they were afraid to leave their homes. They heard testimony from several policemen who testified that the occupants of the Bahia house were not law-abiding citizens, and they heard from [Schultze]'s bond supervisor who outlined several ways

in which [Schultze] had violated the terms of his bond while trial was pending in this first degree felony case.

Accordingly, we hold with fair assurance that the trial court's error in overruling [Schultze]'s objection to the above argument did not influence the jury and did not affect his substantial rights.

177 S.W.3d at 50.

As noted above, the misconduct that Schultze complains of is limited to a single reference, made during closing argument, to the victim's humiliation and the pain that her parents must feel. Although the victim's parents did not testify, any reasonable juror would have necessarily considered the impact of the defendants' actions on both the victim and her family. In fact, Schultze's trial counsel acknowledged in his closing argument that the incident was a "tragedy" that was "visited upon members of not only [A.M.'s] family," but also on the defendants and their family members. *See Court Reporter's Record*, Vol. 28, at 79. Schultze has not demonstrated that the isolated remark by the prosecutor was "persistent and pronounced" or that the evidence of guilt was "'so insubstantial' that but for the improper remarks the conviction or sentence would not have resulted." *Turner*, 106 F.3d at 1188 *see also Geiger v. Cain*, — F.3d —, 2008 WL 3021017, *3 (5th Cir. 2008) (concluding that federal habeas relief was not warranted because, even assuming the prosecutor's remarks were improper, "they were not persistent or pronounced, and the admissible evidence of guilt was not insubstantial"). Thus, Schultze fails to show that the prosecutor's isolated remark "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. Absent a showing that his conviction and

sentence were obtained in violation of due process, Schultze fails to show that his trial was tainted by prosecutorial misconduct.  Alternatively, given the overwhelming evidence of Schultze's guilt, the error, if any, was harmless in this case.  *See Cotton v. Cockrell*, 343 F.3d 746, 752 (5th Cir. 2003).  Therefore, Schultze is not entitled to a federal writ of habeas corpus on this claim.

### C.    Excluding Witness Testimony

Schultze alleges that he was denied due process during his criminal proceeding because the trial court excluded testimony from defense witness Leroy Hall, a former state prisoner, about the harsh treatment Schultze could expect to endure if he were sent to the Texas Department of Criminal Justice.  This claim was raised and rejected on direct appeal. The intermediate appellate court considered the proposed testimony, which was allegedly offered to rebut testimony elicited by the State about prison conditions, and concluded that the trial court's decision to exclude it was not erroneous:

> In point of error four, [Schultze] argues that the trial court erred during the punishment stage of trial in excluding Leroy Hall's testimony about prison conditions, which was essential to rebut the State's lengthy evidence about prison conditions.

> During the punishment stage, Zunker's attorney called Reginald Jenkins as a witness. Jenkins is a detention officer with the Brazos County Sheriff's Department, and he was previously employed as a prison guard at a maximum security prison.  Jenkins testified that Zunker had been a "model inmate" during his more than 300 days of detention at the time of trial. Jenkins explained what a normal day is like for Zunker while in detention, and that, due to his conviction for aggravated sexual assault, he cannot be a prison trustee.

41

Klock's attorney questioned Jenkins about the conditions in maximum security prisons. Jenkins testified that it was "very possible" that the defendants would be going to a maximum security prison, which holds murderers, major drug dealers, embezzlers, and forgers. He further testified that there is "rampant gang affiliation" in prison.

On cross-examination, the State elicited more testimony regarding the conditions in prison. Jenkins testified that rigid laws regulate prisons to make sure they are safe. Prison units have job fairs and classes allowing the inmates to get degrees ranging from G.E.D.s to Ph.D.s, and law libraries that are "second to none." Prison units also have exercise weights, baseball diamonds, basketball courts, and horseshoes. Each prison unit has a minimum of two televisions in each dayroom, and inmates are allowed to see the National Basketball Association finals and the Super Bowl on television.

On re-direct examination, [Schultze]'s attorney asked Jenkins if he felt it would be helpful to hear from someone who "was actually on the inside looking out." Jenkins responded, "possibly."

Later, Zunker's attorney called Leroy Hall to testify about the time that he served in the Texas Department of Corrections from 1990-1997. The State objected that the testimony from Hall concerning prison conditions was irrelevant. Zunker's attorney responded that the State had "opened the door to the country club atmosphere," and the trial court originally agreed. When the State added that the witness was an expert who had not been properly designated, the trial court overruled that objection as well.

After Zunker's attorney asked Hall a few more questions, the trial court began sustaining the State's "relevance" and "invading - the-province-of-the-jury" objections. The trial court then discussed its rulings outside the presence of the jury and reconsidered and sustained the State's relevance objection. The defendants' attorneys made a bill of exception, and, at the conclusion of the bill, the trial court clarified that Hall's testimony was inadmissible, and the court instructed the jury to disregard it. The trial court stated that it based its decision on

[Texas Rule of Evidence] 401, the relevance. I'm also basing my decision on the fact that I did not believe the door was opened by the State. Number three, I'm making my decision on the fact that . . . I still think [Rules] 701 and 702 may apply and

there should have been a notice given that this person was an expert witness.

The Court of Criminal Appeals has explained that, under Texas Code of Criminal Procedure Annotated article 37.07 section 3(a), the admissibility of evidence at the punishment phase of a non-capital felony trial is a function of policy rather than relevancy. *See Mendiola v. State*, 21 S.W.3d 282, 285 (Tex. Crim. App. 2000); *Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990). This is so because, by and large, there are no discrete factual issues at the punishment stage. *Miller-El*, 782 S.W.2d at 895-96. Thus, determining what is "relevant" in regard to punishment, under article 37.07 section 3(a), "should be a question of what is helpful to the jury in determining the appropriate sentence in a particular case." *Mendiola*, 21 S.W.3d at 285. In *Schielack v. State*, 992 S.W.2d 639 (Tex. App. — Houston [14th Dist.] 1999, pet. ref'd), when faced with the attempt to introduce similar evidence to that which was attempted to be introduced here, the Fourteenth Court of Appeals held as follows:

> In the present case, the testimony which [Schielack] sought to introduce was neither [evidence of the circumstances of the offense itself or the defendant himself]. In fact, the testimony consisted of another person's experiences in prison. There is no evidence that [Schielack's] experience would be the same. As such, we believe that the trial court's decision to exclude this testimony was at least within the zone of reasonable disagreement; therefore, the trial court did not abuse its discretion.

*Id.* at 642-43.

[Schultze] argues that *Schielack* is not instructive because Hall's "testimony was not offered to show what [Schultze]'s experiences would be." However, during the defendants' bill of exception, Hall testified, at length, about the consequences of being "fresh meat" in prison. After the recitation, Zunker's attorney and [Schultze]'s attorney asked Hall to comment as to whether each of the defendants would be treated as "fresh meat." Zunker's counsel asked Zunker to stand and then asked Hall, "What about a white male that's never been to prison before that's his size and weight. Is he going to be considered fresh meat or not?" [Schultze]'s attorney then asked [Schultze] to stand, and he asked Hall, "Are the things that you said pertaining to Mr. Zunker . . . , would that go for Mr. Schultze as well?" "Yes. It will go for

43

anybody that goes into the system that's never been there before."  Contrary
to [Schultze]'s assertion on appeal, Hall's testimony was elicited specifically
to educate the jury on what [Schultze]'s prison experiences would be.

The trial court could have reasonably concluded that Hall's testimony
would not have been helpful to the jury in determining the appropriate
sentence in this case. Also, the trial court could have reasonably concluded that
Hall's testimony went beyond the scope of any door opened by the State.
Under the precedent of *Mendiola,* the trial court's decision to exclude the
testimony of Hall was at least within the zone of reasonable disagreement.

Accordingly, we hold that the trial court did not err in excluding Hall's
testimony. Having held that the trial court did not err in excluding Hall's
testimony, we need not determine whether Hall was a properly designated
expert.

177 S.W.3d at 41-44.  Schultze now claims that the state court's decision was unreasonable

and he argues that he is entitled to federal habeas corpus relief for this reason.

The admissibility of evidence is a matter governed by state law.  Even assuming there

was an error, an alleged violation of state law does not merit federal habeas corpus relief.

*See McGuire*, 502 U.S. at 67-68.  A federal habeas corpus court will not grant relief from

errors in a state trial court's evidentiary rulings, if any, unless those errors resulted in a

"denial of fundamental fairness" under the Fourteenth Amendment Due Process Clause.

*Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998) (citing *Porter v. Estelle*, 709 F.2d 944, 957

(5th Cir. 1983)).  Schultze does not demonstrate a constitutional violation in this instance.

The defendant's right to present witnesses is controlled by the Sixth Amendment to

the United States Constitution, which provides that in all prosecutions the defendant shall

"have compulsory process for obtaining witnesses in his favor."  U.S. CONST. amend VI.

The right to compulsory process is not limited to securing witnesses by subpoena, but

44

extends to the right to present evidence to the fact finder.  *Taylor v. Illinois*, 484 U.S. 400 (1988).  There is also a due process right to present evidence and witness testimony.  *See Green v. Georgia*, 442 U.S. 95, 97 (1979).  The right to call witnesses is not absolute, however.  *See, e.g., United States v. Valenzuela-Bernal*, 458 U.S. 858, 866-67 (1982).  In that respect, the right to call witnesses is limited to those whose testimony would have been "relevant and material to the defense."  *Washington v. Texas*, 388 U.S. 14 (1967);  *see also Green*, 442 U.S. at 97 (noting that the hearsay rule may not be applied mechanistically under the unique circumstances of the case to preclude testimony that was "highly relevant to a critical issue in the punishment phase of a trial").

Schultze claims that he was denied the right to present a witness during the punishment phase of his trial, who would have informed the jury about the harsh conditions of imprisonment present in the Texas Department of Criminal Justice.  It is within the common knowledge of jurors that prison conditions are harsh.  In hopes of obtaining probation, counsel for all three defendants reminded jurors, during their closing arguments at the punishment phase of the trial, that a prison sentence is a severe sanction.  Schultze fails to demonstrate that the trial court violated the law by excluding this evidence.  Likewise, considering the damaging evidence against him in this case, Schultze fails to show that he was harmed as a result of the trial court's ruling or that he was denied fundamental fairness as a result.  Absent a showing that the trial court's decision rendered his trial fundamentally unfair, Schultze does not demonstrate that the state court's decision to deny relief was contrary to, or involved an unreasonable application of, clearly established Supreme Court

precedent.  *See McGinnis v. Johnson*, 181 F.3d 686, 693 (5th Cir. 1999) (concluding that the state court's exclusion of certain expert witness testimony did not render the trial unfair or violate due process and did not violate clearly established federal law).   Accordingly, Schultze is not entitled to a federal writ of habeas corpus on this issue.


**IV.     CERTIFICATE OF APPEALABILITY**

Because the habeas corpus petition filed in this case is governed by the Antiterrorism and Effective Death Penalty Act, codified as amended at 28 U.S.C. § 2253, a certificate of appealability is required before an appeal may proceed.  *See Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997) (noting that actions filed under either 28 U.S.C. § 2254 or § 2255 require a certificate of appealability).  "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citing 28 U.S.C. § 2253(c)(1)).

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Under the controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or,

for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336.  Where denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). For all of the reasons discussed above, the court concludes that jurists of reason would not debate whether any procedural ruling in this case was correct or whether the petitioner stated a valid claim of the denial of a constitutional right.  Therefore, a certificate of appealability will not issue.

## V.    CONCLUSION AND ORDER

Based on the foregoing, the Court **ORDERS** as follows:

1.    The petition for a writ of habeas corpus (Doc. # 1) is **DENIED**, and this case is **DISMISSED** with prejudice.

2.    A certificate of appealability is **DENIED**.

The Clerk will provide a copy of this order to the parties.

SIGNED at Houston, Texas, on <u>September 30th</u>, 2008.

47

Nancy F. Atlas
United States District Judge